UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| RUTH M. MORRISON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-24-SEB-JPG |
| | ) | |
| INDIANAPOLIS FIRE DEPARTMENT | ) | |
| CHIEF JAMES GREESON, in his official | ) | |
| capacity, | ) | |
| Defendant. | ) | |

**ENTRY DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND DENYNG PLAINTIFF'S MOTION FOR SANCTIONS**

This cause comes before the Court on the Motion for Summary Judgment [Docket

No. 40] filed by Defendant, Chief James Greeson of the Indianapolis Fire Department

("IFD"), pursuant to Federal Rule of Civil Procedure 56.  Plaintiff, Ruth M. Morrison, a

Captain within the IFD, having brought this suit against Chief Greeson, the highest-

ranking member of the IFD, in his official capacity.  Morrison's complaint alleges that the

IFD violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by

sexually discriminating against her, retaliating against her for complaining about sexual

discrimination, and failing to promote her on the basis of her sex.  For the reasons

detailed in this entry, we <u>DENY</u> Chief Greeson's motion for summary judgment.  In

addition, Morrison's Rule 37(c) Motion for Sanctions [Docket No. 50] based on

Greeson's alleged failure to properly admit requests for admission is <u>DENIED</u> as

untimely.

**Factual Background**

Morrison began employment with the IFD on August 12, 1986, as a firefighter.  In September 1999, she was promoted to the rank of Lieutenant; in June 2003, she was promoted to the rank of Captain.  Def.'s Mem. at 2, 2d Am. Compl. ¶¶ 15-18.  In 2004, Morrison served as Captain at Ladder 31 and was responsible for supervising all personnel on her shift and all equipment at the station.  Morrison Dep. at 18.  During Morrison's tenure as Captain, several incidents occurred in which she was reprimanded or disciplined by IFD personnel which gave rise to her complaint.  We discuss these allegations in detail below.

*The Hair Grooming Incident*

In early 2004, Morrison applied to attend a leadership conference for female firefighters, but she was not selected to attend.  Thereafter, Morrison filed a grievance against Deputy Chief Richard Longerich alleging that he did not follow his own criteria in selecting attendees.  Morrison Dep. at 53, 60-62.

Shortly thereafter, Battalion Chief Richard Van Sant, who at the time was Morrison's immediate supervisor, held a general meeting to discuss the IFD's policy regarding personal hygiene and grooming (General Order 1.40).  He advised Captain Morrison specifically, in front of her crew, that she was out of regulation and needed to pin her hair up.  Van Sant Dep. at 33-34; Morrison Dep. at 69.  Van Sant testified that he felt that Morrison was violating the general order against having loose long hair – which

2

applied to all firefighters, regardless of gender – and that without pinning her hair up Morrison would be unable to establish a good seal on her firefighter's mask, creating a safety hazard.  Van Sant Dep. at 34-37.

Van Sant testified that after the meeting, Morrison approached him and expressed that she would appreciate it if he would not make such remarks in front of the rest of the company.  Van Sant testified that he apologized to Morrison and told her that she was correct – that he should have taken her aside to discuss the policy with her.  Id. at 35.  Morrison was not formally disciplined nor was any discipline recommended as a result of the incident.  Id. at 183-84.

Morrison's version of events differs: she states that two other firefighters who had been present at the meeting told Van Sant that he had been out of line with Morrison, and that Van Sant informed Morrison that if she had an issue with the policy, she should discuss it directly with Deputy Chief Longerich, rather than going up the usual chain of command.  Morrison Dep. at 82-83.  Morrison testified that Van Sant phoned her later that night and apologized.  Id. at 71.  Morrison believes that Longerich sent Van Sant to "find out some charges they could draw me up on because he was amazed that I filed that grievance on him."  Id. at 83 lns. 4-7.  Shortly thereafter, according to Morrison, Chief Walker came to her station and told her repeatedly that "Chief Van Sant is not harassing you," and "I know you were in the military but you need to start taking these things like a man."  Id. at 67-68.

3

*The Missing Radio Incident*

Morrison was on vacation from August 1 until August 11, 2004, studying for promotion exams.  Pl.'s Ex. 10.  When she returned from vacation, she observed in the station's "watch book" – a record of daily documentation kept by the station – that two lieutenants, Wayne Smith and Lou Williams, had reported a radio missing from the station on or about August 1, 2004.  Id. at 33 ln. 20 – 34 ln. 1.  Upon reviewing this information in the watch book, Morrison informed Battalion Chief Van Sant by e-mail, and also posted a message about the missing radio in the IFD "watch room" – an electronic bulletin board accessible via the IFD's internal website.  Id. at 34; Van Sant Dep. at 38 lns. 5-9.  Van Sant later testified that he considered Morrison's watch room posting to be an appropriate step in attempting to locate the radio.  Van Sant Dep. at 40 lns. 16-18.

However, at the time, Van Sant informed Morrison that she should have taken her concern about the missing radio "through the chain of command, instead of publishing [it] for the whole fire [department] to see."[1]  He further instructed Morrison to send him an e-mail on this subject.  Pl.'s Ex. 7 (Aug. 26, 2004 email from Van Sant).  Van Sant testified that, though he did not feel that Morrison acted inappropriately, he criticized Morrison's handling of the incident at the instruction and upon the order of Chief Longerich, who told him "essentially" what to say in his message.  Van Sant Dep. at 43.

_____

[1] Morrison's direct chain of command includes Battalion Chief Van Sant, A Shift Commander John Walker, Deputy Chief Longerich, and ultimately Fire Chief James Greeson. Def.'s Ex. E.

4

That same day, Morrison e-mailed Van Sant an "official report" on the missing radio explaining her actions in attempting to locate it.  Pl.'s Ex. 8.  Van Sant testified that he considered Morrison's response sufficient to fulfill her responsibilities, and that he believes he forwarded her response to Chief Longerich.  Van Sant Dep. at 44 lns. 8-22.

On August 30, 2004, Longerich sent an e-mail to Van Sant, Chief Greeson, and five other chiefs, some of whom were not in Morrison's chain of command, which criticized Morrison's response.  Longerich stated that he had received a copy of Morrison's report from Chief Greeson and that "Chief Greeson should not be involved at this level.  The Chain of command will be adhered to."  Pl.'s Ex. 10.  Longerich indicated displeasure at the way the situation had been handled, stating that he "trust[ed] that all Chiefs and Officers involved are familiar with Dept. General Orders 1.06 sec V (b) pertaining to portable radios and will be determining what disciplinary actions will be taken and with whom.  I await your decisions."  Id.  Longerich sent a second email later that day to Morrison (with copies to several others, including Van Sant and Greeson), which ordered Morrison to transmit to Chiefs Van Sant and Walker a detailed report about how and why the missing radio had apparently been "located" and informed her that "[y]our email to Chief Greeson is not an adequate explanation in addition to being out of your chain of command."  Pl.'s Ex. 13.

The following day, September 1, 2004, Morrison submitted this second, detailed report to Chiefs Van Sant and Walker, in which she stated that she followed the general order regarding security of radios and described having located the missing radio on

August 29, 2004.  However, in the course of looking for the missing radio she discovered that another radio in use by Ladder 31 actually belonged to another station, so she returned that radio to them.  Pl.'s Ex. 14 (Morrison's official report).  Morrison maintained that she had followed the chain of command and the relevant general order.

Also on September 1, 2004, Chief Van Sant sent an e-mail to Chiefs Longerich and Walker indicating that, having read the e-mails from Chief Longerich, he had decided to request a letter of reprimand for Captain Morrison due to her failure to follow the chain of command.  (It is unclear from the record whether Chief Van Sant had yet received Morrison's detailed report at the time he wrote this e-mail.)  He stated that, due to scheduling conflicts including his upcoming vacation, he would be unable to speak to Morrison about this until September 28, 2004.  Pl.'s Ex. 15.  Van Sant testified that this was the only time in his forty-one-year career he had ever requested a letter of reprimand for failure to follow the chain of command, and that he requested the reprimand even though he did not think Morrison had violated the chain of command because he felt Chief Longerich had indirectly ordered him to take disciplinary action against Morrison.  Van Sant Dep. at 57-58.

Later that day, Longerich sent an e-mail to Morrison (with copies to Van Sant and Walker) informing her that, upon review, he had concluded that she had not violated the chain of command.  Pl.'s Ex. 16.  He indicated that "[t]his does not however address possible discipline with regard to the missing radio with Capt. Morrison or the other Lieut[enants] on Ladder 31.  I still expect some action to be taken from the Batt[alion]

6

Chiefs and/or Capt. Morrison."  Id.

Van Sant then responded to Walker and Longerich:

Now that you have exonerated [Captain Morrison] for failure to use the chain of command, I guess we could charge her with something under G.O. No. 1.06, Section V (5) security of portable radio's [sic].  Once again, I am willing to take action with a letter of reprimand, or any other form of discipline you might suggest.  I am wondering about the other chiefs and officers involved, what action will they take, or will Captain Morrison have to take all the punishment.[2]

Van Sant states that he felt the two Lieutenants who had reported the radio missing (while Morrison was on vacation) ought to have been held responsible, as indicated in the above e-mail, but that no discipline was imposed against them.  Van Sant Dep. at 78-79.

On September 22, 2004, another missing radio was discovered about which Morrison informed Van Sant.  Pl.'s Ex. 18.  Van Sant testified that he thought "something was going on and it was awful funny that these radios turned up."  He said he believed that people, including Chief Longerich, were involved in an effort to make Captain Morrison look bad.  Van Sant Dep. at 63-64.

On September 28, 2004, Chief Van Sant issued a written reprimand to Morrison for "problems with lost apparatus radios – across shifts."  Van Sant also noted on Morrison's reprimand that Morrison had done a good job since taking control of Ladder 31.  Def.'s Ex. H.  A written reprimand is the third level of progressive discipline, according to the IFD's discipline policy; Van Sant stated that he had never in his career issued a written reprimand to a captain before. Van Sant Dep. at 70.  Morrison had

---

[2] Pl.'s Ex. 17.

eighteen years of experience and no prior discipline.  Longerich Dep. at 48.  Morrison

wrote a memo to Chief Greeson requesting that the written reprimand be removed from

her file, and informing him that she was "under the perception that [the way the incident

was handled] was intentional to distract my attention from the Promotional Process. . . . I

was the only officer assigned to station 31 trying to recover lost city property and I

received a written reprimand over it."  Pl.'s Ex. 66.  Greeson testified that, at the time, he

did not believe the letter of reprimand was appropriate; he felt Chief Longerich singled

out Captain Morrison in an unfair and inappropriate manner and that Chief Longerich

treated Captain Morrison differently than similarly situated male firefighters.  However,

he did not remove the reprimand from Morrison's file.  Greeson Dep. at 38, 41-42, 44.

Greeson also testfied that, because Morrison had a written reprimand in her personnel

file, she was ineligible for promotion until December of 2005.  Greeson Dep. at 64 lns.

13-23.

Later, in March 2005, Greeson met with Morrison and Human Resources Chief Al

Stovall in Greeson's office.  At this meeting, Greeson informed Morrison that he thought

the radio incident had been handled improperly and was unfair.  He informed her that the

written reprimand would be removed and that he was "kind of dismissing the whole

discipline."  Id. at 44-45.  Greeson testified that he assumed Chief Stovall would remove

the reprimand from Morrison's personnel file.  However, Morrison states that, as of

February 6, 2007, the reprimand remained in her file.  Morrison Aff. ¶ 10.

***The Fuel Run Incident***

On February 4, 2005, Ladder 31 Engineer Frank Lemons took an engine from the station to get fuel.  Morrison ordered Lemons to call the dispatcher, in accordance with procedure, in order to mark the engine "out of service" during the fuel run, but Lemons failed to do so.[3]  Thereafter, when the dispatcher attempted to dispatch Ladder 31 to an alarm, the engine could not respond because it was out of the station with only two firefighters on it.  Such a staffing level is inadequate to respond to an emergency. Longerich Dep. at 69.  Morrison disciplined Lemons via oral counseling as a result of the incident, which in Fire Department parlance is known as "blowing a run."  Morrison Dep. at 20-21.

---

[3] Chief Van Sant testified concerning this matter in his deposition:

Q:    Did he [Lemons] fail to follow orders?

A:    He forgot to call the dispatcher.

Q:    Do you know whether he had been ordered to call the dispatcher?

A:    Yes.

Q:    So he failed to follow orders?

A:    Yes.

Q:    And if he had followed Captain Morrison's order to mark out of service, he never would have been dispatched on the run?

A:    Right.

Van Sant Dep. at 85 ln. 22 – 86 ln. 7.

At the time of the incident, no written policy mandated that an engine must be fully staffed while getting fuel. Greeson Dep. at 51; Van Sant Dep. at 90. It was common at the time for engines to take equipment to get fuel without a full crew. Greeson Dep. at 52.[4]

Greeson instructed Van Sant to impose discipline on Ladder 31 as a result of the "blown run." Van Sant testified that both he and Greeson "knew who it was going to be" that would be disciplined – that is, Captain Morrison – because she was the company officer. Van Sant Dep. at 83. Morrison also testified that Greeson "screamed" at her over the phone about the incident. Morrison Dep. at 46.

Three days later, Van Sant went to the station and read a new directive stating that an engine had to have a full crew while getting fuel from that point on. Id. at 46-47. Later that day, Morrison was called to IFD headquarters with her entire crew, where Chief Walker gave Morrison a documented oral counseling in front of Lemons and Van Sant. Morrison testified that Walker "called [her] an irresponsible officer and then laughed." Id. at 67 lns. 7-8.

---

[4] Longerich testified that he had a discussion with Greeson in which they agreed that this practice should be changed and that engines should be fully staffed when making fuel runs. Longerich testified that at a monthly Battalion Chief meeting (though he cannot remember when the meeting occurred) he instructed the Battalion Chiefs to inform their battalions about this new rule. Longerich Dep. at 75. Captain Morrison (who is not a Battalion Chief) was not at this meeting, though Longerich stated that "[t]o the best of my knowledge" her Battalion Chief, Van Sant, was in attendance. Id. Longerich testifies that he never followed up to find out whether Van Sant relayed the message to Morrison, that the new directive was not in writing, and that it was not in the General Orders of the IFD. Id. at 76. Moreover, Greeson testified that he had learned that Van Sant had not informed his subordinates of the instruction, but did not take disciplinary action against him. Greeson Dep. at 57.

Walker and Van Sant determined that the oral counseling was sufficient discipline for that incident, pending further input from Greeson.  Van Sant Dep. at 92; Walker Dep. at 49.  On February 10, 2005, Greeson recommended that Morrison be further disciplined by imposing a twelve hours suspension without pay.  Greeson Dep. at 58.  Greeson stated that Morrison's "decision to mark [the engine] out of service and to send it out of their district with only two firefighters, rendering it unable to respond to any emergency[,] . . . demonstrates lack of leadership and self discipline to carry the responsibilities of a Company Officer."  Pl.'s Ex. 22.  Therefore, Greeson recommended the suspension based on General Order 1.28 (Substandard Performance) and General Order 1.30 (Neglect of Duty).  Based on Greeson's recommendation, Van Sant recommended a twelve-hour suspension for Captain Morrison – the only time he has recommended such a discipline on any captain.  Van Sant Dep. at 93.  In an e-mail to another IFD employee, about another matter, Longerich informed him that "Morrison got 12 hours today :)".  Pl.'s Ex. 68.  Longerich testified that he had no business reason for sending this message.  Longerich Dep. at 82.

Separately, Chief Walker recommended a twenty-four-hour suspension for Morrison for the same incident.[5]  Pl.'s Ex. 24.  Ultimately, the twenty-four-hour suspension was recommended and approved by the Board of Battalion Chiefs.  Pl.'s Ex.

---

[5] In an e-mail from Longerich to Walker, Longerich states: "I think you and I have convinced the Chief of the wisdom of giving [Morrison] 24 hours. . . . Let's get it done Wed 2/16, Ruth believes discipline should be timely.......wouldn't want to disappoint her."  Pl.'s Ex. 51.

24.  Chief Greeson later (on March 15, 2005) decided to rescind the suspensions, so Morrison did not have to serve them.  Morrison Dep. at 51-52.

### Morrison's Sexual Discrimination Grievance

On March 7, 2005, Morrison filed an internal IFD grievance asserting that she had suffered several instances of sexual discrimination, including disciplinary action "for conduct that male employees routinely engage in without being subject to discipline. . . . I am being unfairly singled out for disciplinary action because I am a woman."  Pl.'s Ex. 27.  Morrison's grievance alleged numerous instances of discriminatory treatment, but principally described the fuel incident and named specifically Chiefs Greeson, Van Sant, and Walker.  Morrison asserts that, to her knowledge, IFD did not investigate this grievance; Van Sant also testified that he was not questioned about it.  Pl.'s Ex. 28; Van Sant Dep. at 122.

On March 15, 2005, Morrison met with Greeson and Stovall in Greeson's office.  At this meeting, Greeson rescinded Morrison's disciplinary actions.  Greeson Dep. at 44.  Morrison also reported to Greeson and Stovall that she feared retaliation for her grievance.  Morrison Dep. at 84.  Greeson and Stovall assured Morrison that IFD would not tolerate retaliation against her and, as a result, Stovall reportedly informed Longerich to put the word out that no officer was to retaliate against Morrison.  Id.; Pl.'s Ex. 28; Greeson Dep. at 81.  Van Sant and Walker testified that no one from IFD told them not to retaliate against Morrison.  Van Sant Dep. at 123; Walker Dep. at 77.

12

*Morrison's Meeting with Van Sant and Walker*

On March 21, 2005, Van Sant and Walker met with Morrison at her station along with another employee, Jimmy Weeden, who sat in on the meeting as a witness.  At this meeting, Morrison reports that she was "repeatedly threatened, intimidated and asked to lie" and that Van Sant and Walker verbally abused and harassed her.  Pl.'s Ex. 28; Morrison Dep. at 73.  Morrison testified that Van Sant held a copy of Morrison's grievance in his lap during the meeting.  Morrison tape-recorded this meeting without the knowledge of the other IFD employees and later prepared a transcript thereof.[6]  Among the statements that Walker made to Morrison at the meeting were:

> I'm not making this a gender matter[,] I'm addressing this to you as an IFD captain of this shift.
>
> So if you decide you want to play the paper game of he said I said we can get into that.  You want to get lawyers we can get into that.  I have been oppressed my whole life[,][7] you seem to feel because you are a female Captain that people are starting to mess with you.  If you monitor this the same way as I do after 38 years you will see that you guys have made yourself a target.
>
> If you violate anything I'm coming after you[.]

---

[6] IFD denies the validity of the tapes and the transcript and disputes whether they fully or accurately depict the conversation among Walker, Van Sant, and Morrison.  Def.'s Mem. at 8 fns. 1-2.  Morrison has provided copies of the tapes to the IFD when requested.  In addition, Walker testified that he could not name any specific inaccuracies in the transcript.  Walker Dep. at 78 lns. 8-10.

[7] Chief Walker is African-American.

> I don't want to receive a lot of phone calls saying I'm giving Pup [another IFD employee] . . . preferential treatment and trying to slam the hammer on Ruth.  That's what I mean when I want this target erased.
>
> I'm going to let you know right now I don't expect to come in Thursday and Chief Longerich come over and ask me why did I come up and harass you. . . . Ruth there again if you want to get into a battle on who said what let's get it on.
>
> [W]hat transpired in this room I expect to stay in this room and if it gets out I know it's only five individuals that could have let it leak out.  Four because I know I'm not telling this to anyone.[8]

In addition, Van Sant made the following statements to Morrison:

> Don't play the sex card[,] sex ain't got nothing to do with it Ruthie.  If you were a male and all this stuff were to come down you would still be sitting there getting this information from the Chief and I.  Now if you want to play the sex card you go ahead[,] I've been to the EEOC before, you want to do that[,] you want to go that way[,] you go ahead and go.  The best thing you could do is grit your teeth and push on and do your job and keep this house out of trouble.  That's all I'm gonna say about it.[9]

Walker concedes that his conduct during this meeting was unprofessional.  Walker Dep. at 76.  Greeson listened to portions of Morrison's recording of this meeting and agreed that Walker and Van Sant threatened and intimidated Morrison and used inappropriate language in doing so, and that Morrison was retaliated against by chiefs in the department.  Greeson Dep. at 26, 82-83.

***Morrison's Retaliation Grievance and Findings of the Grievance Panel***

On March 28, 2005, Morrison filed an internal IFD grievance asserting that she

_____

[8] Def.'s Ex. M.

[9] Id.

had been retaliated against for her prior sexual discrimination complaint.  In her grievance, Morrison described the meeting among herself, Van Sant, and Walker.  Pl.'s Ex. 28.

On May 12, 2005, IFD convened a grievance panel which addressed both Morrison's grievances.  The panel found that the IFD had discriminated against Morrison on the basis of sex with respect to the fuel incident, in not investigating her first grievance, and in the meeting between Morrison, Walker, and Van Sant.  Pl.'s Ex. 29. The panel recommended that Chief Greeson take appropriate disciplinary action against Longerich, Van Sant, and Walker.

On May 31, 2005, Greeson issued his concurrence with the findings of the panel. Def.'s Ex. O.  As of June 6, 2005, Greeson planned to discipline Longerich by oral counseling only and Walker and Van Sant by oral counseling and training only.  Greeson Dep. at 95-96; Pl.'s Ex. 96 (Greeson handwritten notes).  However, as of June 16, 2005, Greeson had not yet imposed any discipline.  Greeson Dep. at 109.

***Morrison's EEOC Charge and Subsequent Actions Against IFD Chiefs***

On June 30, 2005, Morrison filed a Charge of Discrimination with the EEOC, of which Chief Greeson received notice.  At some point in time, which "may have" been after learning about the EEOC charge, Chief Greeson "moved away from what [he] previously stated" about the discipline to be imposed on Longerich, Walker, and Van Sant and decided to impose more severe disciplinary actions.  Greeson Dep. at 98.  On

July 8, 2005, Greeson handed down disciplinary actions for the three chiefs.[10]  Id. at 110.

Van Sant was reassigned to the Administration Division of the IFD due to his violation of the IFD General Orders regarding Discrimination/Sexual Harassment and Conduct Unbecoming a Firefighter.  He was also ordered to complete the City's Title VII training program and was ordered to be placed on administrative leave from July 22, 2005 through August 1, 2005.  Def.'s Ex. P.  Greeson visited Van Sant at home to tell him he felt he had no choice but to discipline him.  Greeson Dep. at 111; Van Sant Dep. at 163.

Van Sant was never placed on administrative leave.  Van Sant Dep. at 134.  He was reassigned to the Administration Division as ordered, but approximately six weeks later he returned to his prior position as Battalion Chief.  Id. at 133.  Greeson admitted that the perception might be in reinstating Van Sant to his prior position that he was undoing the prior discipline.  Greeson Dep. at 115.  In addition, Van Sant lost no pay as a result of the discipline.  Van Sant Dep. at 134.

Longerich was issued a written reprimand and was ordered to complete the City's Title VII training program.  Def.'s Ex. R.  As of August 28, 2006, over a year after being ordered to do so, Longerich had not yet completed the training.  Longerich Dep. at 97.

Walker was suspended for forty-eight hours and was ordered to complete the City's Title VII training program due to his violation of the IFD General Orders regarding

---

[10] Greeson did not know whether the disciplinary action forms for the three chiefs made it into their personnel files.  Greeson Dep. at 118.  Chief Van Sant testified that he found no record of his disciplinary action in Van Sant's personnel file.  Van Sant Dep. at 160.  Longerich testified that a copy of his written reprimand was placed in Longerich's personnel file. Longerich Dep. at 97.

16

Discrimination/Sexual Harassment and Conduct Unbecoming a Firefighter.  Def.'s Ex. Q.

The IFD's overtime policy states that any firefighter suspended for forty-eight hours or more is ineligible for overtime for six months.  Pl.'s Ex. 54.  However, Walker worked overtime within six weeks of his suspension and was able to earn back approximately half of the money he lost due to the suspension.  Walker Dep. at 93-95.

### Support Party For Chiefs Walker and Van Sant

After the above described disciplinary actions were ordered for the Chiefs, IFD firefighters organized a party at the IFD union hall to demonstrate their support for Chiefs Walker and Van Sant.  An e-mail announcing the event was posted on the IFD watch room message board on July 9, 2005.  The message stated: "As most of you have heard. Two of our most senior and trusted chief officers have been diciplined over an EEOC issue.  There will be a party on Monday June 11th [*sic* – the party was held on July 11] at 5:30 pm to support these officers.  This is important.  try to attend".  Pl.'s Ex. 35.  A second email was sent to Indianapolis Black Firefighters Association members through the IFD email system promoting the party.  Pl.'s Ex. 36.  Greeson testified that he learned about the party before it occurred, but did not take action to stop it.  The party was held at the IFD union hall, which can be rented out by any firefighter for private events, but was not officially sponsored or promoted by the IFD.  Greeson testified that he told his battalion chiefs not to attend the party.  Greeson Dep. at 123-25; Def.'s Ex. T.

Chiefs Van Sant and Walker did attend the party, along with one hundred to two

hundred other people. Van Sant Dep. at 138, 143; Walker Dep. at 10.  Morrison did not

attend the party.  Firefighters raised approximately seven hundred dollars each for Walker

and Van Sant.  Van Sant Dep. at 138; Walker Dep. at 11-12.  Greeson testified that this

collection counteracted the unpaid suspension imposed as a disciplinary measure against

Van Sant and Walker.  Greeson Dep. at 128-29.  At the party, tee shirts were auctioned to

raise money, including tee shirts saying "Ladder 31," a reference to Morrison's company.

Morrison also testifies that she was told that tee shirts which read "IFD – no balls" were

auctioned.  Morrison Dep. at 104.  Van Sant testified that a firefighter at the party lit a tee

shirt on fire with a lighter and said "this is more fire than Ruth Morrison has ever seen,"

which was followed by cheers from the crowd.  Van Sant Dep. at 180-81.

### 2004 IFD Promotion Process

The 2004 IFD promotion process for the rank of Battalion Chief began in May

2004 and concluded in December 2006, the effective date of the promotions.  Pursuant to

municipal ordinance, the Civilian Fire Merit Board ("the Merit Board"), in conjunction

with the Chief of the IFD, establishes processes for selecting candidates for promotion.

Municipal Code of the Consolidated City and County § 252-206(c) (Def.'s Ex. U).  The

Chief then makes promotions with the approval of the Merit Board.  Id. at §252-206(d).

Promotions are governed by a weighting of various components, which include such

factors as a written exam,[11] oral interview, level of seniority, certifications, and practical

---

[11] The test was scored by an outside consulting firm.  Longerich Dep. at 128.

exercises.  The weighting of the various components has varied somewhat over the years.
See Def.'s Exs. V, W, X (weighting of components for 1999, 2001, and 2004 promotions
processes).

The promotions process development committee, which included no women,[12]
decided in late 2003 to re-weight the promotion components for the 2004 process.  The
changes were intended to give more weight to seniority and "time in grade" as captain
than were previously granted.  College, military service, training, and certifications were
given less emphasis than previously accorded.  The minutes of the committee's meeting
state that these changes were made in order to avoid "double-counting" certain course
work and because a higher-than-average retirement rate made it important to ensure that
individuals with lengthy job experience were well-represented in the upper ranks.  Def.'s
Ex. Y.  The committee did not base these changes on any specific evidence which
demonstrated that seniority or time in grade correlated with readiness for promotion.
Greeson Dep. at 167.  For the 2004 promotion process to chief, no female at IFD could be
eligible for the full points total available for seniority.  Greeson admitted that the
emphasis on seniority adversely impacts women and that he thought there was an adverse
impact on women in the 2004 promotion process.  Id. at 154, 176.  Further, Morrison

---

[12] Greeson Dep. at 151.  In addition, Morrison notes that Walker served on the
committee, and that one of the chosen "raters" – none of whom were women – attended the Van
Sant/Walker support party and was a good friend of Van Sant and Longerich.  Pl.'s Resp. at 23.
Longerich participated in the oral assessments of candidates during the December 2004 process
– after he had been disciplined for his conduct toward Morrison –  but he did not recall
specifically whether he interviewed Morrison.  Longerich Dep. at 116-18.

asserts that the IFD completed an adverse impact and seniority analysis for the 2004 promotion process, which confirmed that no woman could achieve maximum points in seniority or time in grade.  Pl.'s Ex. O.

Morrison appealed these changes to the promotion process in November 2004.  In a memo to the committee, she stated that the felt the "time in grade" component "was intentionally designed and added to this process to discriminate against Women, Black-women, and Hispanics."  Pl.'s Ex. 100.  Morrison asserts that during the meeting to discuss her appeal, a member of the promotional committee called her a "cunt" in front of several witnesses.  Pl.'s Ex. 28.

Captain Morrison was the only woman out of seventeen candidates to compete for promotion to battalion chief in the 2004 promotional process.[13]  Def.'s Ex. AA.  Morrison ranked sixteenth out of seventeen candidates.  Def.'s Ex. BB.  She asserts that she was not given credit for her college training or for excess certification hours.  Morrison Dep. at 133-35.  Greeson testified that he did not think Morrison should have been ranked sixteenth out of seventeen in terms of readiness for promotion to battalion chief.  Greeson Dep. at 177.

Around December 2005, Chief Greeson recommended the top four candidates, as well as the candidates ranked seventh and thirteenth – all males – to the Merit Board.  The

---

[13] There are 709 officers at IFD, approximately forty of whom are women.  None of the thirty chiefs is a woman.  There has been only one female battalion chief, Nancy Rasmussen, in the history of the IFD.  Greeson Dep. at 15, 190.  Rasmussen and Morrison are the only women in the history of the IFD to compete for promotion to battalion chief.  Id. at 191.

Merit Board approved his recommendations, and those candidates were promoted.

Greeson Dep. at 184-87.  Greeson testified that he recommended the seventh- and

thirteenth- ranked candidates because they had both already been performing the duties of

the promoted positions before the promotion process.  Id.

## **Legal Analysis**

### I.     **Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party

and draws all reasonable inferences in favor of the non-moving party.  See id. at 255.

However, neither the "mere existence of some alleged factual dispute between the

parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the

material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of

Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. <u>Id.</u> at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. <u>Waldridge v. Am. Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. <u>See Shields Enterprises, Inc. v. First Chicago Corp.</u>, 975 F.2d 1290, 1294 (7th Cir. 1992); <u>Wolf v. City of Fitchburg</u>, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. <u>See Celotex</u>, 477 U.S. at 322; <u>Ziliak v. AstraZeneca LP</u>, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 323.

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. <u>Seener v. Northcentral Technical Coll.</u>, 113 F.3d 750, 757 (7th Cir. 1997); <u>Wohl v. Spectrum Mfg., Inc.</u>, 94 F.3d 353, 354 (7th Cir. 1996). To that

end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts.  Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

## II.    Morrison's Title VII Claims

Title VII provides that "it shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Morrison makes four related arguments – that she was discriminated against on the basis of her gender with respect to the terms and conditions of her employment; that she was subjected to a hostile work environment; that she was retaliated against for complaining about unlawful discrimination; and that she was discriminated against on the basis of her gender with respect to the IFD's failure to promote her to Battalion Chief.  We address each of Morrison's claims in turn.

### A.    Terms and Conditions of Employment

A plaintiff may prove a claim of discrimination under Title VII either by presenting direct evidence of discrimination or by proceeding under the McDonnell

23

Douglas burden-shifting method of proof.  See McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973); Herron v. DaimlerChrysler Corp., 388 F.3d 293, 299 (7th Cir. 2004).

Though Morrison does not explicitly specify which method of proof she means to

employ, she has addressed only the requirements of the McDonnell Douglas framework

in her brief, so we shall follow her lead and proceed solely with that analysis.  Pl.'s Resp.

at 28.

Under the burden-shifting method, a plaintiff must initially demonstrate a *prima*

*facie* case of discrimination.  If one can be established, the burden shifts to the defendant

to articulate a nondiscriminatory reason for the actions it took against the plaintiff.  If the

defendant can offer a legitimate nondiscriminatory reason for the employment decision,

the burden reverts to the plaintiff to show that there is a genuine dispute of material fact

that the proffered reason for the employment action is pretextual.  Nese v. Julian Nordic

Constr. Co., 405 F.3d 638, 641 (7th Cir. 2005).

Thus, our initial inquiry is whether Morrison has demonstrated a *prima facie* case

of discrimination on the basis of her gender with regard to the terms and conditions of her

employment.  In that regard, she must show: (1) that she was part of the class protected

by Title VII; (2) that she was meeting her employer's legitimate job expectations; (3) that

she suffered an adverse employment action; and (4) that the circumstances surrounding

the adverse action indicate that it is more likely than not that her gender was the reason

for it.  IFD appears to concede that Morrison is a member of the statutorily-protected

class and that she was meeting its legitimate job expectations.  See Def.'s Mem. at 15.

24

Therefore, we need address only the third and fourth prongs of Morrison's *prima facie* claim.

<ol>
<li style="text-align:center;">Adverse Employment Actions</li>
</ol>

Morrison asserts that she suffered adverse employment actions with respect to both the disciplinary actions taken against her – specifically, the written reprimand she received as a result of the radio incident and the oral counseling and suspension ordered as a result of the fuel incident – as well as the creation of a hostile work environment based on her gender, denial of promotion to chief, and retaliation for sex discrimination complaints.[14]  Pl.'s Resp. at 28.

Greeson rejoins that, because the discipline alleged by Morrison was never imposed (in the case of the suspension) or was later rescinded (in the case of the reprimand), she did not suffer an adverse employment action.  He argues that hostile comments made by other employees and the support party at which co-workers expressed dislike for her do not effect a "qualitative or quantitative change in the terms and conditions of employment."  Herron v. Daimler Chrysler Corp., 388 F.3d 293 (7th Cir. 2004).  See also Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998) (holding that a letter of reprimand without an accompanying tangible job consequence does not constitute an adverse employment action).

It is clear that, at the very least, Morrison has established that genuine issues of

---

[14] We address Morrison's hostile work environment, retaliation, and failure to promote claims in greater detail below.

material fact exist as to whether she suffered one or more adverse employment actions.

"The 'purpose of the adverse employment action requirement is to provide a reasonable

limiting principle for the type of conduct actionable under the statute.'" Lewis v. City of

Chicago, No. 06-2302 (slip copy) at 11-12 (7th Cir. July 26, 2007) (quoting Phelan v.

Cook County, 463 F.3d 773, 780 (7th Cir. 2006)).  The adverse employment action

requirement is useful in order to distinguish meritorious cases from trivial personnel

actions brought by disgruntled employees.  Id. at 12.  The serious and disturbing

mistreatment alleged by Morrison (and, to a great degree, factually uncontroverted by the

IFD) places this case firmly in the former camp.[15]

Morrison asserts that, as a result of the written reprimand imposed upon her, she

was disqualified from eligibility for promotion to Battalion Chief.  Def.'s Resp. at 32.

Greeson disputes this, citing the fact that Morrison did participate in the promotion

process, because Greeson did not cite Morrison's reprimand as the reason she was passed

over for promotion and because Greeson told her the reprimand had been disregarded.

However, the fact that a written IFD policy mandates her disqualification from

promotion, as well as the fact that Greeson never followed up on his request to have the

reprimand removed from Morrison's file (and the fact that the paper remained in her file,

---

[15] Moreover, Greeson's assertions that the IFD took prompt remedial action to rectify alleged harassment and therefore has discharged its legal duty are disputed by Morrison, as explained in detail in the statement of facts.  Greeson himself admitted that some of the discipline he imposed upon the chiefs was effectively "undone" by allowing Walker to work overtime and allowing Van Sant to transfer back to his prior position after only six weeks.  It is clear that, at the very least, issues of material  fact exist as to whether prompt remedial action was taken.

26

according to Morrison's testimony) are sufficient to establish a dispute of material fact. Further, as Morrison rightly points out, Seventh Circuit caselaw is clear that an employer may not escape liability by rescinding prior discipline once an employee pursues legal recourse against the employer.  Phelan, 463 F.3d at 780.  Therefore, we hold that Morrison has met her burden in establishing this prong of her *prima facie* case.  See Lewis v. City of Chicago, No. 06-2302 (slip copy) at 14 (7th Cir. July 26, 2007) ("Adverse employment actions should not be defined so narrowly as to give an employer a 'license to discriminate.' . . . An employer cannot discriminate against an employee and then hide behind the argument that the employee's deprivation was not material.  'The primary objective of Title VII is not to provide redress but to avoid harm.'") (internal citations omitted).

### 2.   Circumstances Suggesting Discrimination

The fourth prong of a plaintiff's *prima facie* claim *may* be proven by demonstrating that she was treated less favorably than, or was replaced by, a similarly situated male employee.  There is support for this interpretation of the fourth prong in several Seventh Circuit cases.  See, e.g., Rooney v. Koch Air, LLC, 410 F.3d 376, 380-81 (7th Cir. 2005); Amadio v. Ford Motor Co., 288 F.3d 919, 924 (7th Cir. 2001); Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 472 (7th Cir. 2002).  However, the Seventh Circuit has also stated that this prong is not necessary "to make out a prima facie case, so long as there is some evidence from which one can infer that the employer took adverse

action against the plaintiff on the basis of statutorily proscribed criterion." Leffel v.

Valley Financial Svcs., 113 F.3d 787, 793 (7th Cir. 1997).  To determine whether the

circumstances suggest that a plaintiff's gender was the reason an employer took adverse

action against her, a plaintiff "may (not must)" demonstrate that "similarly situated . . .

employees were treated more favorably."  Timmons v. General Motors Corp., 469 F.3d

1122, 1127-28 (7th Cir. 2006).

    Morrison points to Lou Williams and Wayne Smith – the lieutenants at her station

who were (arguably) responsible for the lost radio – as comparators.  Williams and Smith

are not proper comparators because, in order to demonstrate that an employee is similarly

situated, a plaintiff "must show that there is someone who is directly comparable to [him

or] her in all material respects."  Patterson v. Avery Dennison Corp., 281 F.3d 676, 680

(7th Cir. 2002).  The comparator must be similar "in terms of performance, qualifications,

and conduct. . . . This normally entails a showing that the two employees . . . had engaged

in similar conduct without such differentiating or mitigating circumstances as would

distinguish their conduct or the employer's treatment of them."  Id. at 617-18.  No such

showing has been made here; Williams and Smith were not of Morrison's rank, but were

her subordinates, and she was at least partially responsible for their discipline.  Therefore,

they are not valid comparators.

    However, Morrison also introduces as a comparator Captain Norm Weddle, who

allegedly lost a radio in a separate incident and received no discipline.  Morrison Dep. at

65-66.  Morrison asserts that Weddle was also commanded by Chief Van Sant.  Id. at 65

28

lns. 17-24.  Moreover, both Morrison *and Greeson* testified that Morrison was disciplined for "offenses" that other (male) firefighters were not disciplined for.  Greeson's admission of this fact, as well as the candid testimony of Chiefs Longerich, Van Sant, and Walker, surely demonstrate that Morrison has established the existence of triable issues of fact as to whether the IFD discriminated against her on the basis of her sex.

3.    Burden Shifting to Defendant

Because Morrison has met her *prima facie* burden, the burden shifts to Greeson to articulate a nondiscriminatory reason for the actions taken against her. Greeson misstates this rule in his briefs and asserts repeatedly that *Morrison* has not demonstrated that the IFD's reasons for discipline and nonpromotion were phony or lacking in factual basis. However, Morrison need do no such thing unless and until Greeson demonstrates a legitimate nondiscriminatory reason for the IFD's actions.  To this end, Greeson asserts merely, and without explanation or support, that "Morrison engaged in conduct that warranted responsibility on her part," and "[Morrison] cannot dispute her scores on the 2004 promotion exam."  Def.'s Mem. at 22.  These two sentences do not sufficiently demonstrate a legitimate nondiscriminatory reason for the numerous allegations of discrimination raised by Morrison.  Therefore, the burden does not shift back to Morrison to establish that this reason is, in fact, pretextual.  Morrison has established that triable issues of fact exist which defeat summary judgment as to this claim.

## B.      Hostile Work Environment

In Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986), the Supreme Court clarified

that the "terms, conditions, or privileges of employment" language in Title VII

encompasses *environmental* conditions of employment, and that the scope of the

prohibition "is not limited to 'economic' or 'tangible' discrimination." Id. at 64.

Therefore, "a plaintiff may establish a violation of Title VII by proving that

discrimination based on sex has created a hostile or abusive work environment." Id. at

66.

In order to rise to the level of a hostile work environment that violates Title VII, a

plaintiff must show that he or she was sexually harassed because of his or her sex, and

that the harassment was "sufficiently severe or pervasive [as] to alter the conditions of the

victim's employment and create an abusive working environment." Oncale v. Sundowner

Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Harris v. Forklift Sys., Inc., 510

U.S. 17, 21 (1993) (citations and internal quotation marks omitted)). See also Hilt-Dyson

v. City of Chicago, 282 F.3d 456, 462-63 (7th Cir. 2002), cert. denied, 537 U.S. 820

(2002) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (citation and

internal quotation marks omitted)).

In order to determine whether a working environment is hostile, courts may

consider factors including "frequency of the discriminatory conduct; its severity; whether

it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." Hilt-Dyson, 282 F.3d at

463 (quoting <u>Faragher v.City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998)).  Conduct that

is unpleasant, but is not severe or pervasive, will not constitute a hostile work

environment prohibited by Title VII.  <u>See</u> <u>Saxton v. American Telephone and Telegraph</u>

<u>Co.</u>, 10 F.3d 526, 533 (7th Cir. 1993).

Morrison asserts that the environment to which she was subjected at the IFD was

severely hostile and pervasive enough to constitute a hostile work environment.  Morrison

asserts that she was "persecuted" by her superiors' repeated attempts to wrongfully

impose discipline on her for false allegations of rule violations regarding radios,

grooming, and getting fuel.  She claims she was told to "[take] these things like a man,"

was called a "cunt,"and was freely informed that women were unwelcome in the

environment.[16]  When Morrison went through internal channels to air her grievances,

firefighters organized a party in support of the guilty chiefs, raised money for them, and

invoked Morrison's name as they burned a tee shirt.[17]  Def.'s Resp. at 32-33.

---

[16] Van Sant testified in his deposition that he made his opinion known at the IFD that he did not think the IFD was a place for women.  He stated that in his opinion "the fire department is a man's job."  Van Sant Dep. at 19-20.

[17] Greeson asserts that the comments made at the firefighters' party do not support a case of discrimination because they are not specifically linked to Morrison's sex.  Def.'s Mem. at 20.  However, the context of the statements – a support fundraiser for two officers disciplined due to the grievance panel's finding that they had sexually discriminated against Morrison – cannot be ignored.  It is clear that these comments are within a sufficient nexus to Morrison's gender to be considered here.

Greeson also objects to what he characterizes as Morrison's "kitchen sink" approach in her effort to demonstrate the existence of a hostile work environment, and argues that some of the conduct Morrison describes was not included as part of her EEOC charges or her federal lawsuit.  Def.'s Reply at 3-4.  Because a hostile work environment consists of the amalgamation of numerous instances of discriminatory conduct, it is not surprising that not every one of these

(continued...)

Morrison has provided more than enough evidence of a hostile work environment at the IFD to withstand Greeson's motion for summary judgment. The discriminatory treatment Morrison alleges is frequent and substantially severe and could certainly be understood to alter the conditions of her employment. Morrison's allegations of retaliation, mistreatment by her superiors, and harassment through trumped-up or inequitable disciplinary charges amount to more than "isolated incidents," teasing, or offhand comments, as Greeson characterizes them; in some cases, even IFD officials have directly admitted that the conduct alleged not only occurred, but was inappropriate, retaliatory, and threatening. Morrison has clearly met her burden here and has the right to present her hostile work environment claim at trial.[18]

---

[17](...continued)
alleged acts was specifically enumerated in her EEOC charges or the complaint.

The purpose of this requirement is to provide notice to the employer of the conduct of which the employee is aggrieved. See McKenzie v. Illinois Dept. of Transp., 92 F.3d 473, 481-82 (7th Cir. 1996) (noting that a plaintiff "need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint"); Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d 164, 167 (7th Cir. 1976) (plaintiff may bring claims that are "like or reasonably related to the allegations of the charge and growing out of such allegations."); Cheek v. Western & Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994) (plaintiffs are afforded "considerable leeway" because EEOC complaints are most often compiled without the assistance of counsel). Therefore, Greeson's complaints of untimeliness shall not preclude Morrison's claims.

[18] In addition to the evidence cited, Morrison attempts to verify the severity of the harassment by means of a psychological evaluation conducted by Dr. Elgan Baker of the Indiana University School of Medicine. Morrison attempts to use Dr. Baker's report to demonstrate that workplace stressors have affected her psychological and physical health. Pl.'s Resp. at 33-34. Greeson objects to this expert testimony on the basis that Dr. Baker was not timely disclosed as an expert in accordance with the parties' case management plan. Because we conclude that Morrison's hostile work environment claim survives summary judgment on the basis of sufficient evidence other than Dr. Baker's report, we disregard it here, and do not address the

(continued...)

**C.    Retaliation**

Under Title VII, it is unlawful "for an employer to discriminate against any of [its] employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).  Morrison asserts that the IFD retaliated against her for her complaints of discrimination when Walker and Van Sant intimidated her after she filed her first grievance, and subsequently "ratcheted up" the level of discipline they recommended against her as a result of the fuel incident.  Moreover, IFD employees held a party to express financial and moral support for the disciplined chiefs.  In addition, the IFD failed to promote Morrison to Battalion Chief.  Am. Compl. ¶¶ 55-62; Pl.'s Resp. at 34.

An employee may establish a *prima facie* case of retaliation either under the direct or indirect method of proof.  Roney v. Illinois Department of Transportation, 474 F.3d 455, 459 (7th Cir. 2007).  Though Morrison does not specify which method of proof she means to employ, we conclude that she has articulated sufficient evidence under the direct method of proof to survive summary judgment.  Under the direct method, Morrison must demonstrate that she engaged in a statutorily protected activity, that she suffered an adverse action taken by her employer, and that there was a causal connection between the two.  Tomanovich v. City of Indianapolis, 457 F.3d 656, 663 (7th Cir. 2006).  Because Morrison's grievance constitutes a constitutionally protected activity, see id., and we have

_____

[18](...continued)
timeliness of Morrison's disclosure or the admissibility of Dr. Baker's testimony/report at trial.

previously determined that she suffered an adverse action,[19] we need only address the final prong.

Without a doubt, Morrison has established that triable issues of fact exist which suggest a causal connection between her protected activity and the IFD's treatment of her. The clearest example is the meeting Morrison audiotaped between herself and Chiefs Van Sant and Walker in which Van Sant and Walker allegedly threatened and intimidated her her while Van Sant held a copy of Morrison's grievance in her lap, and made statements such as "I've been to the EEOC before, you want to do that[,] you want to go that way[,] you go ahead and go.  The best thing you could do is grit your teeth and push on and do your job and keep this house out of trouble."  Def.'s Ex. M.  This evidence by itself is sufficient to survive summary judgment on the retaliation issue.[20]

### D.   Failure to Promote

With respect to her failure to promote claim, Morrison asserts both that she was

---

[19] We note that "the discriminatory acts proscribed by Title VII's anti-retaliation provision are not limited to those that affect the terms and conditions of one's employment." Roney, 474 F.3d at 461.  The action must be one that a reasonable employee would find to be adverse such that he or she would be dissuaded from engaging in protected activity.  Lewis v. City of Chicago, No. 06-2302 (slip copy) at 15-16 (7th Cir. July 26, 2007).

[20] Greeson maintains that, because the IFD did not officially sponsor the party, and it was held by individual firefighters on their private time, it cannot be considered retaliatory conduct by the IFD.  Morrison does not dispute Greeson's contention in her brief.  Though we note that a plaintiff may demonstrate sex discrimination by showing "the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees," (Bohen v. City of East Chicago, 799 F.2d 1180, 1187 (7th Cir. 1986)), we need not determine specifically at this juncture whether the support party constituted an act of retaliation, since we have determined that Morrison's retaliation claim survives based on other actions of the IFD.

discriminated against individually *and* that the weighting of promotion process components had a disparate impact on women generally.  Morrison asserts that she was individually treated unfairly by the promotion committee in that she was harassed while on vacation to study for exams by trumped-up disciplinary infractions, that "four chiefs of the department embarked upon a coordinated campaign to disqualify her" (Pl.'s Resp. at 29), that the promotion committee was populated by men who were not inclined to treat Morrison fairly (including Longerich and Walker, who were both disciplined for their conduct with respect to Morrison), and that a written reprimand was placed in her file which would render her ineligible for promotion (which she describes as "the ultimate trump card in case she scored well in spite of all of the hindrances" (id. at 30)), and which was not physically removed when so ordered by Chief Greeson.

Moreover, Morrison asserts that the promotion process itself was stacked against women, based on the weighting of factors like seniority and time in grade.  Morrison states that the IFD disregarded its own adverse impact study, and notes that Greeson himself admitted that there was an adverse impact on women in the 2004 promotions process, and that Morrison's ranking did not accurately reflect her readiness for promotion.[21]

---

[21] Morrison also introduces the expert opinion of Dr. Donald Hartnett, Professor Emeritus of Decision Sciences at Kelley School of Business at Indiana Univerity.  Dr. Hartnett recalculated the scores to minimize adverse impact and concluded that Morrison would have ranked tenth out of seventeen and scored higher than two men who were promoted.  Greeson objects to this expert testimony on the basis that Morrison's expert disclosure was untimely according to the case management plan.  Because we conclude that Morrison's failure to

(continued...)

Greeson asserts that the change in weighting of the promotion process components has a legitimate business necessity – namely, the fact that the department was likely to lose a high number of firefighters to retirement, and wanted to emphasize experience. Greeson asserts that Morrison is seeking "special" treatment due to her status as a woman.  Def.'s Mem. at 21.

Neither Morrison nor Greeson devotes much space in their briefings to Morrison's failure to promote claim nor does either cite much caselaw in support of their arguments. However, based on the evidence adduced thus far, we consider it inappropriate to dispose of Morrison's failure to promote claim at the summary judgment stage.  Though Morrison's evidence of disparate treatment and disparate impact is far from watertight, it does cast sufficient doubt on the propriety of the promotions process so as to allow her to proceed to trial.  See Price Waterhouse v. Hopkins, 490 U.S. 228, 241 (1989) ("The critical inquiry . . . is whether gender was a factor in the employment decision[.] . . . Title VII meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations.").  Morrison's assertions of impropriety and efforts to hinder her promotion, as supported by the evidence as described, are sufficient to survive the summary judgment stage with respect to her individual treatment.

Under a disparate impact theory, an employer is held liable when a facially neutral

---

[21](...continued)
promote claim survives summary judgment on the basis of sufficient evidence other than Dr. Hartnett's opinion, we disregard it here, and do not address the timeliness of Morrison's disclosure.

employment practice disproportionately impacts members of a legally protected group.

Reidt v. County of Trempealeau, 975 F.2d 1336, 1340 (7th Cir. 1992).  Greeson's own

express acknowledgment that the IFD's promotions process has a disparate impact on

women in itself casts significant doubt on the neutrality of the process.  Moreover, the

disparate impact report allegedly conducted by IFD (Pl.'s Ex. O), which Morrison asserts

demonstrates a disparate impact, is sufficient to overcome the summary judgment hurdle.

The IFD is certainly welcome to challenge Morrison's assessment of this report at trial,

but since it has not yet done so, it cannot prevail at this stage.

## III.    Morrison's Motion for Sanctions

Morrison has also filed a Motion for Sanctions for Failure to Admit Requests for

Admission, pursuant to Federal Rule of Civil Procedure 37(c).  Rule 37(c) provides that a

party that fails to disclose information sought pursuant to Rule 26 may be required to pay

the reasonable expenses, including attorney's fees, that the opposing party incurs in

proving these matters.  Morrison asserts that Chief Greeson failed to admit the truth of

eleven requests for admission, which all related to the support party for the disciplined

IFD chiefs.  Morrison states that Chief Greeson unreasonably stated that he could not

admit or deny the requests because no IFD administrators were present at the event, while

in fact three battalion chiefs were present.  Pl.'s Mot. ¶¶ 38-40.

Morrison's motion must be denied at this stage but only because it is premature.[22]

---

[22] We express no opinion regarding the merits of Morrison's motion.

Morrison may not recover the expenses she seeks unless and until she actually *proves*, at trial, that Greeson's responses were untruthful.  See <u>Cada v. Costa Line, Inc.</u>, 95 F.R.D. 346, 348 (N.D. Ill. 1982) (describing a similar motion as "premature, for Rule 37(c) contemplates applications to be made after trial"); <u>Mayes v. City of Hammond</u>, 2006 WL 2251877 at *2 (N.D. Ind. August 1, 2006) ("If a party believes a response to a request to admit is incorrect, the appropriate remedy under Rule 26 is to prove the matter *at trial*, *and then* apply to the court for reasonable expenses, including reasonable attorney fees, in making that proof.") (emphasis added).  Because Morrison's motion is untimely, it is <u>DENIED</u>.

## IV.    Conclusion

For the reasons detailed in this entry, Defendant's Motion for Summary Judgment is <u>DENIED</u> in its entirety.  Plaintiff's Motion for Sanctions is also <u>DENIED</u>.  IT IS SO ORDERED.

Date: _____07/31/2007_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Edward O'Donnell DeLaney
DELANEY & DELANEY LLC
ed@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Elizabeth Ann Schuerman
DELANEY & DELANEY LLC
lizzie@delaneylaw.net

Ian L. Stewart
OFFICE OF CORPORATION COUNSEL
istewart@indygov.org